IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IAN LOCKHART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:25-cv-324-MAB |
| | ) |
| DEANNA BROOKHART, | ) |
| JEREMIAH BROWN, | ) |
| ANDREW D. WALTER, DR. MYERS, | ) |
| L. CUNNINGHAM, LUKING, | ) |
| WEXFORD HEALTH SOURCE, and | ) |
| CHRISTOPHER EASTON, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Ian Lockhart, an inmate of the Illinois Department of Corrections who is currently incarcerated at Lawrence Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. In the Complaint, Lockhart alleges that Defendants were deliberately indifferent to his medical needs and denied him access to accommodations in violation of the Eighth Amendment and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. He also alleges that he was denied religious items in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1.

1

This case is now before the Court for preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A.[1] Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b).

## **The Complaint**

Lockhart suffers from pain in his back, neck, shoulder, hip, legs, knees, and feet (Doc. 1, p. 7). He also experiences numbness in his left leg and knee (*Id.*). While at Stateville Correctional Center, he received an order for special insoles with arch support for his shoes (*Id.*). He also received an order for a knee brace (*Id.*). In late 2016, he transferred to Pontiac Correctional Center, where medical staff ordered his arch support insoles and issued him a waist chain permit to prevent his arms from being cuffed behind his back (*Id.*). From December 2020 through March 2021, Lockhart also conferred with a neurologist who diagnosed him with nerve damage and sciatica (*Id.*).

In 2020, medical staff at Pontiac prescribed Lockhart with Tramadol for his nerve pain (Doc. 1, p. 7). The specialist prescribed additional nerve and pain medications to accompany the Tramadol (*Id.*). On April 15, 2021, Lockhart also received a lumbar epidural steroid injection for his pain and numbness (*Id.* at p. 8).

---

[1] The Court has jurisdiction to screen the Complaint in light of Plaintiff's consent to the full jurisdiction of a Magistrate Judge, and the limited consent by the Illinois Department of Corrections and Wexford Health Sources, Inc., to the exercise of Magistrate Judge jurisdiction as set forth in the Memoranda of Understanding between this Court and these two entities.

On March 1, 2022, Lockhart transferred to Lawerence Correctional Center (Doc. 1, p. 8). Upon arriving at Lawrence, he informed medical staff about his conditions and his need for ADA accommodations. Lockhart alleges that he previously had a low bunk/low gallery permit, a cane or other walking assistance, knee and back braces, and the arch support insoles (*Id.*). On March 10, 2022, during a warden tour of the gallery, Lockhart spoke to assistant warden Jeremiah Brown and healthcare administrator L. Cunningham about his need for ADA accommodations (*Id.*). Both indicated that they would look into his requests, although Cunningham indicated that the prison did not allow inmates to possess canes (*Id.*).

On March 18, 2022, Nurse Practitioner Luking renewed Lockhart's waist chain permit (Doc. 1, p. 8). She also told Lockhart she would look into his requested accommodations and schedule him to see the doctor. On March 24, 2022, Lockhart spoke to warden Deanna Brookhart about his ADA accommodations. She directed him to medical staff but also took notes of his requests and told him to be patient with his requests (*Id.* at p. 9). Sometime between March and April, Lockhart's Tramadol prescription was discontinued (*Id.*). He continued to submit medical request slips and requested to have his pain medication renewed, but his requests were ignored.

On June 6, 2022, Lockhart went to an outside specialist for another spinal injection (Doc. 1, p. 9). During transport from the prison to the medical facility, Lockhart alleges that he was placed in a 4' x 4' steel box in the back of a prison van (*Id.*). His feet were shackled, and his body chained. He had no room to extend his legs and remained

3

hunched over (*Id*.). Every bump in the road sent sharp pains through his back. The ride to and from the specialist was 2 ½ hours each way (*Id*.).

On June 9, 2022, Lockhart submitted a medical request slip to see a doctor about the pain from his transport in the steel box (*Id*.). On June 14, 2022, he saw a nurse about his pain. On June 17, 2022, Lockhart met with Luking about his pain from the transport vehicle (*Id*. at p. 10). He also spoke to Luking about the discontinuation of his Tramadol prescription (*Id*.). Luking informed Lockhart that the prison doctor, Dr. Myers, did not like prescribing Tramadol to inmates. Luking did, however, indicate that she would submit Lockhart for an appointment with Dr. Myers about his ADA accommodations and his issue with the prison transport (*Id*.). Lockhart spoke with Luking again on September 28, 2022 about his continued inability to see the prison doctor (*Id*.). Luking noted that there were not enough medical professionals at the prison to see inmates in a timely manner and she asked him to be patient as she worked to schedule Lockhart with Dr. Myers (*Id*.).

On October 28, 2022, Lockhart again spoke with Brookhart and Cunningham during a tour of the cellhouse (Doc. 1, p. 10). Lockhart noted that he had been at the prison for 8 months without seeing the doctor and still had not received his accommodations (*Id*.). According to Lockhart, Brookhart rolled her eyes and walked away (*Id*.). Cunningham indicated that there was only one doctor at the facility, but she would make sure to put Lockhart on his list (*Id*.).

On November 19, 2022, Lockhart finally saw Dr. Myers (Doc. 1, p. 11). Dr. Myers noted that he was aware of Lockhart's prior transport in a steel box and noted that

security should have known better than to transport Lockhart in that fashion. Dr. Myers wrote a medical permit requiring transport in a regular prison van (*Id.*). Dr. Myers denied Lockhart's request for Tramadol, noting that he does not prescribe it for inmates because they only use it to get high (*Id.*). He refused to address Lockhart's request for ADA accommodations, noting that he did not have time and was in a rush (*Id.*). He denied Lockhart's request for a back and knee brace, noting that the items would not help Lockhart's condition and stated that he would review the other requests at a later time (*Id.*). Dr. Myers indicated that he would schedule Lockhart for another spinal injection (*Id.*).

On November 22, 2022, the legal organization Equip for Equality wrote Brookhart and other IDOC officials, including ADA compliance officer Andrew Walter, about the complaints of numerous inmates at Lawrence who claimed they were being denied necessary accommodations (Doc. 1, pp. 11-12). Lockhart's requests for permits, including low bunk/low gallery permit, cane, knee and back brace, arch support, waist chain permit, and permit to allow Lockhart to be transferred outside of a steel box was included in the letter (*Id.* at p. 41). On January 6, 2023, Lockhart again spoke to Brookhart about his pain, but she merely made some notes and walked away (*Id.* at p. 12).

On January 21, 2023, Lockhart learned that Lawerence would start transporting inmates with their hands cuffed behind their back, despite any permits to the contrary (Doc. 1, p. 12). Lockhart filed a grievance about the new directive (*Id.* at pp. 12-13). He also submitted a medical request to have his waist chain permit renewed (*Id.* at p. 13). On February 24, 2023, he met with Luking about his request for accommodations and she

noted that he would be seeing Dr. Myers (*Id*.). Luking renewed his waist chain permit, but with new wording allowing security to cuff Lockhart behind his back before being taken to an area to be waist chained (*Id*.). Lockhart questioned Luking about the change, noting the cuffing behind his back caused him long-lasting pain (*Id*.). Luking indicated she had received an email from security about the change and he would have to address his concerns with security staff (*Id*.). On March 10, 2023, he met with Luking again about his pain, but she informed him that he would see Dr. Myers soon (*Id*.).

On March 25, 2023, Lockhart met with Dr. Myers (Doc. 1, p. 14). Dr. Myers noted that he should have already been sent out to an outside doctor for another spinal injection. Dr. Myers claimed that he had personally made the appointment and did not know why Lockhart was never sent out to the appointment, but he would make another appointment for Lockhart (*Id*. at p. 14). Dr. Myers noted that he did not have time to address Lockhart's accommodation requests but noted that he would schedule Lockhart for x-rays and an MRI (*Id*.). On March 27, 2023, Lockhart did receive x-rays of both of his knees and was scheduled for physical therapy (*Id*.).

On May 8, 2023, Lockhart was scheduled for another spinal injection, but he objected to transport in the steel box (Doc. 1, p. 14). He informed security staff that he had a medical permit prohibiting use of the steel box (*Id*.). After reviewing the permit and making some phone calls, security informed Lockhart that Brookhart had overridden the medical permit because medical were not allowed to issue that type of permit (*Id*.). Although Lockhart was asked if he was refusing medical care, Lockhart denied that he was refusing care but instead was refusing transport in the steel box (*Id*. at p. 15). He did

6

sign a refusal form but marked out that he was refusing medical treatment and wrote that he was refusing the form of transportation (*Id.*). He wrote an emergency letter to the healthcare unit about security staff's refusal to honor his permits. He received a response noting that Dr. Myers was unaware at the time that he was unable to write that type of permit, but the permit was now cancelled (*Id.*).

On June 24, 2023, Lockhart again met with Dr. Myers who claimed ignorance as to the cancellation of his transport permit (Doc. 1, p. 15). Dr. Myers acknowledged that the permit was necessary to permit further deterioration of Lockhart's condition, but he directed Lockhart to address his complaints to Brookhart because she overrode the permit (*Id.* at pp. 15-16). Dr. Myers also indicated that he would speak directly with Brookhart (*Id.* at p. 16). He also agreed to prescribe Lockhart muscle relaxers and an injection of pain medication for the next scheduled appointment (*Id.*).

On June 27, 2023, Lockhart finally received his arch support insoles, well over a year after initially requesting the supports (Doc. 1, p. 16).

In August 2023, Lockhart addressed his concerns with his medical care with Brown (*Id.*). He complained about the lack of permits, his need to attend an outside appointment for a spinal injection, and his inability to attend showers and yard due to the pain caused by the prison's new cuffing policy (*Id.*). Brown noted that Lockhart was always complaining about something and simply walked away, ignoring Lockhart's complaints (*Id.*). In October, Lockhart spoke with Brookhart about his concerns. She informed him that the prison did not allow canes, he did not need a knee and back brace because the devices would only make his condition worse, and he did not need a low

bunk/gallery permit because he was already assigned to a single-man cell on a lower gallery (*Id*.).

Although Lockhart initially was single-celled in administrative detention, on October 19, 2023 he was moved to general population and on December 19, 2023, moved to a cell on an upper gallery (Doc. 1, p. 17). By January 2024, his toes were hurting due to going up and down the stairs. His leg gave out at one point.

Starting in February 2024, Lockhart alleges that he started receiving some of his requested care. On February 19, 2024, he was scheduled to go to an outside specialist for a CT scan of his knees and shoulders (Doc. 1, p. 17). On April 9, 2024, he was finally sent to a foot specialist (*Id*.). On November 5, Lockhart saw a specialist for his knee pain and on December 3 he received his spinal injection (*Id*.). On February 10, 2025, he was finally moved to a bottom gallery cell and received a low bunk/low gallery permit (*Id*. at p. 18). But Lockhart alleges that there were significant delays in receiving these requested accommodations and appointments.

In addition to his issues with his medical care, Lockhart also alleges that officials at Lawrence refused his requested religious items (Doc. 1, p. 19). On July 27, 2022, Lockhart submitted a request for a stainless-steel necklace and a medallion of the Star of David to signify his faith as a Hebrew Israelite (*Id*.). Lockhart alleges that the jewelry met all prison rules and administrative directives (*Id*.). On August 17, 2022, the items were received at Lawrence and forwarded to the chaplain for review (*Id*.). But Lockhart learned that the items were denied for safety and security reasons (*Id*.). Lockhart grieved the denial of his necklace and religious medallion (*Id*.). He also spoke to warden Brown about

8

chaplain Christopher Easton's denial of his religious items (*Id*.). Lockhart noted that other inmates had the exact same medallion (*Id*.). Brown acknowledged that he had previously approved the same medallion for other inmates, but the medallion was denied now because it could be used as a weapon (*Id*. at pp. 19-20). Although Lockhart noted that there was a circle around the points of the star, Brown noted that the circle could be broken off, exposing the points of the star. Instead, Lockhart could only obtain a medallion if the star was etched into a flat surface with no exposed points (*Id*. at p. 20).

On January 6, 2023, Lockhart spoke with Brookhart about the denial of his medallion (Doc. 1, p. 20). He again noted that other inmates had the same medallion. Brookhart denied that Lockhart was Jewish, but then noted he had to order a different kind of medallion that met the prison's rules (*Id*.).

On May 19, 2023, Lockhart submitted a request for a religious garment known as fringes (Doc. 1, p. 20). On June 7, 2023, he again wrote the chaplain's office. The counselor responded with communications he had with Chaplain Easton about Lockhart's requests (*Id*.). Easton noted that the item was generally considered an approved item but that the warden would have to give final approval after seeing the items (*Id*.). Lockhart placed an order for the garment. But upon receiving the item at the prison, Lockhart learned from Easton that the item was denied because of possible security threat group ("STG") issues (*Id*. at p. 21). Easton noted that Brookhart and Brown believed the color of the garment would cause STG issues. Although Lockhart noted that the color of the fringes (blue) was allowed at every other maximum-security prison he had previously been at, Easton indicated it was a security threat and his request was denied (*Id*.).

On August 11, 2023, Lockhart received a formal written denial for his requested fringes (Doc. 1, p. 21). Lockhart spoke with both Brown and Easton about the denial, but Brown denied that Lockhart's religion required the color blue and that white fringes were available (*Id*. at pp. 21-22). Lockhart disputed that white fringes were sufficient for his particular religion (*Id*.).

### Preliminary Dismissals

Although Lockhart lists Andrew Walters as a defendant in the case caption and identifies him as IDOC's ADA compliance officer, he fails to allege that Walters acted with deliberate indifference towards his need for accommodations. In order to state a claim for deliberate indifference under the Eighth Amendment, a plaintiff must allege that he had an objectively serious medical condition and that the defendant was deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). Lockhart only alleges that Walters was addressed in the letter from Equip for Equality which included some of Lockhart's requests. But Lockhart fails to allege that Walters was personally involved in handling Lockhart's ADA requests at Lawrence or that he personally denied any of Lockhart's requested accommodations. *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) (defendant must be personally involved in the constitutional deprivation). Thus, any claim against Walters is **DISMISSED without prejudice** for failure to state a claim.

Similarly, Lockhart lists Wexford Health Sources as a defendant in the case caption but does not include any allegations against the company in his statement of claim. He only alleges in conclusory fashion that the company and other officials had policies that

10

denied Lockhart the minimal measures of life's necessities (Doc. 1, p. 18). Wexford can only be liable for deliberate indifference if it had a policy or practice that caused the constitutional violation. *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (applying municipal liability to private corporations performing governmental functions); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). But Lockhart fails to allege what policies, if any, were implemented by Wexford that led to the denial of his requests for care and/or accommodations. Thus, any claim against Wexford is also **DISMISSED without prejudice**.

## Discussion

Based on the allegations in the Complaint, the Court designates the following counts:

**Count 1:** Eighth Amendment deliberate indifference to medical needs claim against Deanna Brookhart, Jeremiah Brown, and L. Cunningham for denying and delaying Lockhart's requests for medical care and denying his requests for ADA accommodations.

**Count 2:** Eighth Amendment deliberate indifference to medical needs claim against Luking and Dr. Myers for denying and delaying Lockhart's requests for medical care and denying his requests for ADA accommodations.

**Count 3:** ADA claim against Defendants for denying Lockhart's requests for accommodations.

**Count 4:** First Amendment claim against Deanna Brookhart, Jeremiah Brown, and Christopher Easton for burdening Lockhart's practice of his religion by denying him access to a Star of David and blue fringes.

**Count 5:** Fourteenth Amendment Equal Protection claim against Deanna Brookhart, Jeremiah Brown, and Christopher

>   Easton for denying Lockhart access to a Star of David and blue fringes that were available to other inmates.
>
> **Count 6:** RLUIPA claim against Deanna Brookhart, Jeremiah Brown, and Christopher Easton for denying Lockhart access to a Star of David and blue fringes essential to the practice of his religion.

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard**.[2]

**Counts 1 and 2**

At this stage, Lockhart states viable claims for deliberate indifference against officials at Lawrence. He alleges that he personally spoke with Deanna Brookhart, Jeremiah Brown, and L. Cunningham about his need for medical care and ADA accommodations, but they either outright denied his requests or delayed his requests for care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016); *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (delay in treatment). He also alleges that Brookhart overrode his medical permits and had Lockhart transported in violation of his permits. Accordingly, Count 1 shall proceed against Brookhart, Brown, and Cunningham.

---

[2] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face").

12

As to the medical defendants, Lockhart alleges that Luking and Dr. Myers denied and delayed his medical care. Although he alleges that Luking provided him with some care and permits, he also alleges that she denied his request for Tramadol and other requested accommodations, indicating that Dr. Myers would make those determinations. Although Lockhart alleges that Luking indicated she would put Lockhart on the list to see Dr. Myers, Lockart was not able to see Dr. Myers until many months after arriving at Lawrence. Those delays could amount to deliberate indifference. *Gomez*, 680 F.3d at 865. Further, Dr. Myers denied Lockhart's request for Tramadol, denied many of his requested accommodations, and/or delayed determinations about his care. Accordingly, Count 2 shall proceed against Luking and Dr. Myers.

**Count 3**

Lockhart also states a viable ADA claim regarding the Defendants' denial of Lockhart's numerous requested permits. The claim cannot proceed against the individual defendants, however, because individual employees of IDOC cannot be sued under the ADA and RA. *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 670 (7th Cir. 2012). The proper defendant is the relevant state department or agency. *See* 42 U.S.C. § 12131(1)(b); *Jaros*, 684 F.3d at 670, n. 2 (individual capacity claims are not available; the proper defendant is the agency or its director (in his official capacity)). As such, Latoya Hughes, the current IDOC Director, will be **ADDED** to the case, in her official capacity only, as the proper defendant for Lockhart's ADA claim.

**Counts 4-6**

Lockhart's claims for discrimination of his religious faith in Counts 4, 5, and 6 are unrelated to his claims regarding the treatment of his medical conditions. Federal Rule of Civil Procedure 20 prohibits a plaintiff from asserting unrelated claims against different defendants or sets of defendants in the same lawsuit. In other words, multiple defendants may not be joined in a single action unless the plaintiff asserts at least one claim to relief against each defendant that arises out of the same transaction or occurrence or series of transactions or occurrences and presents a question of law or fact common to all. FED. R. CIV. P. 18, 20(a)(2); *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007).

Unrelated claims against the same defendant may be joined in one action, but different defendants can be joined in one action only if the claims against them arise from the same series of transactions or occurrences. FED. R. CIV. P. 18, 20; *Kadamovas v. Stevens*, 706 F.3d 843 (7th Cir. 2013) (court "can require the plaintiff 'to file separate complaints, each confined to one group of injuries and defendants.'"); *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012) ("A litigant cannot throw all of his grievances, against dozens of different parties, into one stewpot. Joinder that requires the inclusion of extra parties is limited to claims arising from the same transaction or series of related transactions."); *George*, 507 F.3d at 607 ("Unrelated claims against different defendants belong in different suits ...").

Here, Lockhart's claims regarding the denial of his religious garment and necklace arise from different transactions and occurrences than that of his medical claims. His religious claims involve additional defendants, took place at different times, and involve

14

different legal questions. Although Lockhart includes Brookhart and Brown in both his religious and medical claims, the religious claims involve unrelated allegations and interactions with these officials. As such, the claims in Counts 4-6 are subject to severance into a new lawsuit as set forth below.

### Motion for Counsel

In addition to his Complaint, Lockhart also filed a motion seeking the assignment of counsel (Doc. 2). Lockhart notes that he has mental health issues which make it difficult for him to concentrate. He also has comprehension issues. Lockhart subsequently filed a motion to supplement with additional exhibits demonstrating his attempts to obtain counsel on his own (Doc. 8). But given the early stage of the litigation process, it is difficult to accurately evaluate the need for the assistance of counsel. *See Kadamovas v. Stevens*, 706 F.3d 843, 846 (7th Cir. 2013) ("[U]ntil the defendants respond to the complaint, the plaintiff's need for assistance of counsel ... cannot be gauged.").[3] Defendants have not been served or filed Answers. Once Defendants have been served and file their Answers, the Court will enter a scheduling order setting forth the next steps in the litigation process. If Lockhart experiences difficulties in litigating the case at that point, he may submit another request for counsel. At this time, his motions are **DENIED without prejudice**.

---

[3] In evaluating the motion for counsel, the Court applies the factors discussed in *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007), and related authority.

15

## Disposition

For the reasons stated above, Counts 4-6 are severed into a new case against Deanna Brookhart, Jeremiah Brown, and Christopher Easton. In the new case, the Clerk of Court is **DIRECTED** to file the following documents:

- This Memorandum and Order;
- The Complaint (Doc 1); and the
- The motion to proceed *in forma pauperis* (Doc. 2).

As to the remaining claims, Count 1 shall proceed against Deanna Brookhart, Jeremiah Brown, and L. Cunningham. Count 2 shall proceed against Luking and Dr. Myers and Count 3 shall proceed against Latoya Hughes, in her official capacity only. All other potential claims and defendants are **DISMISSED without prejudice**.

The Clerk of Court shall prepare for Deanna Brookhart, Jeremiah Brown, L. Cunningham, Luking, Dr. Myers, and Latoya Hughes (official capacity): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons) and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each defendant's place of employment as identified by Lockhart. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a defendant can no longer be found at the work address provided by Lockhart, the employer shall furnish the Clerk with the defendant's current work address, or, if not known, defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. Section 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order**.

**Because Lockhart's claims involve his medical care, the Clerk of Court is DIRECTED to enter the Court's standard HIPAA Qualified Protective Order.**

If judgment is rendered against Lockhart, and the judgment includes the payment of costs under Section 1915, he will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Lockhart is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **14 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: May 22, 2025**

/s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

### Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your Complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to your Complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answer, but it is entirely possible that it will take **90 days** or more. When all the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. **Plaintiff need not submit any evidence to the Court at this time, unless specifically directed to do so.**